UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Moien Louzon,

       Plaintiff,

v.                                                    Case No.: 09-11205

Ford Motor Co.,                                       Honorable Sean F. Cox

       Defendant.

_____/

OPINION & ORDER GRANTING DEFENDANT'S MOTION IN LIMINE
AND ORDERING PLAINTIFF TO SHOW CAUSE

Plaintiff Moien Louzon ("Plaintiff" or "Louzon") filed this claim against his former

employer, Defendant Ford Motor Company ("Defendant" or "Ford"), alleging age discrimination

under the Age Discrimination in Employment Act ("ADEA") and national origin discrimination

under Title VII (Count I), as well as retaliation for engaging in protected activity (Count II).

Plaintiff also alleges similar state law claims under the Elliot-Larson Civil Rights Act

("ELCRA").  The matter is currently before the Court on Defendant's Motion in Limine to

Exclude Evidence and Argument Concerning Non-Comparable Employees (Doc. No. 67).  The

Court heard oral argument on August 4, 2011, and for the reasons discussed below, granted

Defendant's motion in limine.

In light of the Court's determination on Defendant's motion in limine, and after

reviewing the transcript of the July 12, 2010 hearing before Judge Anna Diggs Taylor on

Defendant's motion for summary judgment, the Court finds that there are material facts that may

1

not be genuinely in dispute. Accordingly, the Court shall order Plaintiff to show cause, pursuant to FED. R. CIV. P 56(f), as to why this Court should not grant summary judgment in favor of Defendant on Counts I and II of Plaintiff's Complaint.

BACKGROUND

I.     Procedural Background

Louzon filed this employment discrimination action on March 3, 2009, and Ford removed the case to this Court on March 31, 2009. This case was originally assigned to the Honorable Anna Diggs Taylor. Judge Taylor denied Ford's motion for summary judgment but did not issue an opinion on the motion. Instead, ruling from the bench, she denied Ford's Motion for Summary Judgment at a hearing on July 12, 2010. (*See* July 12, 2010 transcript, Doc. No. 71). Although Ford raised the issue of similarly-situated employees, Judge Taylor did not address the facts underlying this issue at the hearing. In making her decision, Judge Taylor stated, without further explanation:

> The motion has to be denied. The plaintiff, in the light most favorable, has presented evidence supporting the allegation that he was treated differently from Amro, who was similarly situated.
>
> The retaliation claim also, although it was not argued, appears to have been a matter of differential treatment so -- and why has the plaintiff never got notice when he must return? Why didn't he ever get -- well, never got notice that he was going to be fired and never got a deadline as to when he must return. And why, first of all, did he get only 87 days when Amro got 102.
>
> I'm sorry, the motions have to be denied.

(July 12, 2010 Transcript at 28).

On December 6, 2010, this case was reassigned to this Court. Ford filed the instant motion in limine on April 26, 2011. Louzon filed a response brief on May 10, 2011, and Ford

replied on May 23, 2011.  The Court held a hearing on Ford's motion in limine on August 4,

2011, and granted Ford's motion.

II.     Factual Background

      While employed at Ford, Louzon worked as a hardware engineer in the Powertrain

Control Modules and Sensors Design and Release department, which is a part of the Powertrain

Engineering organization of Product Development.  (Def's Br. at 2).  Product Development

consists of approximately 5,000 product engineers and over 300 managers.

      In January 2007, Louzon began planning a trip to Palestine to visit his mother, whom he

alleged was ill.  (Plf's Br. at 4).  Louzon scheduled his vacation for May 31, 2007, and planned

his vacation to coincide with Ford's general shutdown period from July 2 to July 8 so that he

could extend his trip for a total of 5 weeks.  *Id*.  In March 2007, Louzon notified his supervisor,

Mary Ann Kantrow, of his vacation.  The vacation was also approved by Louzon's manager,

Owen Bailey ("Bailey").  *Id*.  Before Louzon left for his vacation, however, Bailey notified

Louzon that he required Louzon to return to work on June 25, 2007, because of an imminent,

high-profile product build.  (Def's Br. at 2).  On May 31, 2007 Louzon left for his 3 ½ week

vacation.  *Id*.

      Louzon first spent some time visiting the pyramids of Egypt and the Sinai Desert.

(Louzon Dep. at 34).  Soon after Louzon arrived in Gaza, violence broke out and the Israeli

government closed its borders.  (Plf's Br. at 6).  Louzon became stranded in Palestine.  Louzon's

June 25th return date passed and Ford did not receive any word from Louzon as to why he had

not returned to work.  On July 4th  – nine days after his scheduled return date – Louzon sent an

email to Bailey and Kantron, explaining his situation.  *Id*.   Upon receiving this email, Bailey

placed Louzon on a 45-day leave of absence.

According to Bailey, he initially intended to place Louzon on a 30-day leave of absence, but due to an error, Louzon's leave of absence was inputted into the system as a 45-day leave of absence. Nonetheless, Bailey decided to allow Louzon the benefit of the 45-day leave of absence. (Bailey Dep. at 88-89). Personal Relations Representative Leslie Harris ("Harris") expressed disapproval at the idea of placing Louzon on a leave because he felt that Louzon had misled his supervisors about his return date and questioned whether Louzon actually adjusted his vacation to return on June 25th , as ordered by Bailey.

Throughout Louzon's leave of absence period, Louzon exchanged a number of emails with his supervisors, but never indicated when he would be able to return to work. On August 22, 2007, Harris, still under the impression that Louzon was granted only a 30-day leave, emailed Human Resources Representative Michelle Bricker ("Bricker") and suggested that, because Louzon had not returned to work, that a 5-day "quit letter" should be sent to Louzon. (Plf's Br., Ex. I at 183). Harris then processed the quit letter, which stated that Louzon had 5 business days to submit documentation to Harris to explain his absence from work. (Plf's Br., Ex. N). By August 24, 2007, the last day of Louzon's 45-day leave of absence, Louzon had still not returned to Ford.

On August 24, 2007, Louzon emailed Bailey and notified him that he and his family had been evacuated from Gaza and that he was working on getting back to the United States "ASAP." (Plf's Br., Ex. I at 359). This email was forwarded to Harris. Harris responded to the person who forwarded him the email by stating, "Pretty convenient timing if you ask me." *Id*. at 359. Additionally, Michell Bricker stated, "Hmmmm. . . something isn't right with this whole

4

situation (and I know you know what I mean)."  *Id.*

Bailey testified that he made the decision to terminate Louzon prior to receiving Louzon's email on August 24, 2007, because he was not sure when Louzon would return and because other employees had sufficiently assumed Louzon's job duties.  (Bailey Dep. at 87-90). Louzon's termination was categorized as a "voluntary quit" under the Unpaid Personal Leave Policy.

Not knowing that his employment had been terminated, Louzon finally returned to work on August 31, 2007.  Human resources then notified Louzon that he had been terminated and escorted him out of the building.

## ANALYSIS

When a plaintiff seeks to create an inference of discrimination using circumstantial evidence,[1] the plaintiff carries the initial burden of establishing, by a preponderance of evidence, a *prima facie* case of discrimination by his employer.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).  In order to prove a *prima facie* case for both age discrimination under the ADEA and national origin discrimination under Title VII, a plaintiff must show that: (1) he is a member of the protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a person outside the protected class or was treated differently from similarly-situated employees outside the protected class.  *DiCarlo,* 358 F.3d at 414; *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004).

In order for a plaintiff to compare himself to a similarly-situated employee who is outside of the protected class, the comparable employee must be similarly-situated in all relevant

---

[1]Plaintiff does not allege that any direct evidence of discrimination exists.

5

aspects. *Jackson v. International Fiber Corp.*, 395 Fed.Appx. 275, 280 (6th Cir. 2010).

Furthermore, the Sixth Circuit has stated:

> [T]o be deemed 'similarly-situated' the plaintiff seeks to compare
> his/her treatment must have dealt with the same supervisor, have been
> subject to the same standards and have engaged in the same conduct
> without such differentiating or mitigating circumstances that would
> distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *see also Jackson*, 395 Fed.Appx. at

280 (6th Cir. 2010); *Carson v. Patterson Companies, Inc.*, No. 09-4559, 2011 WL 1827352 (6th

Cir. 2011). Moreover, "the term 'supervisor' should be construed broadly to include cases

where both employees' situations were handled by the same 'ultimate decision-maker.'" *Barry

v. Noble Metal Processing, Inc.*, 276 Fed.Appx. 477, 481 (6th Cir. 2008). As Ford states in its

brief, the Sixth Circuit has consistently found that employees are not similarly situated, in part,

because they were disciplined by different supervisors. *See Smith v. Leggett Wire Co.*, 220 F.3d

752, 762-63 (6th Cir. 2000); *Corell v. CSX Transportation, Inc.*, 378 Fed. Appx. 496, 502 (6th

Cir. 2010); *Barry*, 276 Fed. Appx. at 480 (6th Cir. 2008).

   In this case, Louzon seeks to introduce evidence at trial of employment decisions by Ford

regarding seven other Ford employees. Louzon alleges that these individuals were similarly-

situated employees who were treated differently than him. Ford, however, contends that these

seven employees were disciplined by different supervisors than the supervisor who disciplined

Louzon and the decisions were made under entirely different circumstances. Ford asserts that

any evidence and argument concerning these employees is therefore irrelevant and inadmissable

under FED. R. EVID. 401 and 402.

   Alternatively, Ford states that, even if evidence regarding the other employees is

relevant, the evidence should still be excluded because "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative issues." FED. R. EVID. 403. Specifically, Ford states that it would be "highly prejudicial" for Louzon to attack Bailey's exercise of discretion in ending Louzon's leave because the comparisons are based upon "faulty comparisons to employment decisions made by other managers in different organizations under different factual circumstances." (Def's Br. at 10).

Additionally, Ford asserts that requiring Ford to explain at trial the specific circumstances and business reasons behind each of the other leave decisions would unnecessarily prolong the trial and result in a series of "mini-trials."

I.      Owen Bailey, Louzon's Supervisor, Made The Determination To Terminate Louzon.

Before determining whether the comparable Ford employees were similarly-situated to Louzon, the Court must first determine the person or entity that made the determination to terminate Louzon.

In response to Ford's Motion, Louzon, contends that Bailey was not the ultimate decision-maker and that all salary-level disciplinary decisions are made by Ford's Personnel Relations department. (Plf's Br. at 1). Louzon insists that Personnel Relations Representative Harris made the determination to terminate Louzon, and that Personnel Relations treated Louzon's alleged insubordination differently than other engineers' insubordination. In support of this position, Louzon submitted the deposition testimony of Richard Gross, Director of Personnel Relations and Employee Policies, who's duty, among others, is to review misconduct terminations. Gross testified that it is the duty of the Personal Relations Manager to approve all

disciplinary decisions.  (Gross Dep., at 16-17).

Ford, however, has provided evidence that Louzon was not terminated for misconduct, but rather, was terminated as a "voluntary quit" under Ford's Unpaid Personal Leave Policy ("the Policy").  The Policy gives discretion to supervisors, rather than Personnel Relations, to make decisions regarding leaves of absence.  The Policy states, "The supervisor/manager will approve, deny, or hold the request [for a leave of absence].  The Leave of Absence request is not authorized until the supervisor/manager has processed it."  (Def's Br., Ex. B at 2).  The Policy also provides, "Failing to return on or before the 'leave ending date' may result in termination as a voluntary quit effective the leave ending date."  *Id*. at 3.

Ford suggests that the deposition testimony of Gross was provided solely in response to Ford's "after-acquired evidence" that Louzon misled his supervisors about his intentions to return by Bailey's June 25, 2007 deadline.   Ford states, and Gross' deposition reflects, that Gross merely testified that Louzon ***could have been*** fired for breach of trust or insubordination if Ford had known about Louzon's misleading information provided to supervisors regarding the circumstances surrounding his leave.

Based upon the record before the Court, the evidence clearly indicates, even when viewed in a light most favorable to the Plaintiff, that Bailey made the ultimate decision which led to Louzon's termination.  Contrary to Louzon's position, Louzon was not terminated by Personnel Relations as a result of any sort of misconduct on the part of Louzon.  Rather, Louzon was issued a 5-day "quit letter" following his failure to timely return from his 45-day leave of absence, consistent with Ford's leave of absence policy.  While the record does indicate that on June 25, 2007, Harris recommended that Louzon not be granted the initial leave of absence, it

8

was Bailey who made the determination to grant, and subsequently not to renew, Louzon's leave.

Ultimately, Bailey's decision not to renew Louzon's leave resulted in a voluntary quit because

Louzon did not timely return from his leave.  In fact, in his deposition, Harris repeatedly testified

that he had no involvement in Louzon's termination.

      As further support, Ford provided the declarations of eight supervisors and managers

who stated that they made decisions within their departments regarding unpaid personal leaves

of absence.  All eight supervisors declared that decisions regarding personal leaves are within the

supervisor's discretion, and that upon an employee's failure to timely return from a leave of

absence, that employee is terminated as a voluntary quit pursuant to the Policy.  (Def's Br., Exs.

9-14).  Additionally, Bailey stated in his affidavit:

> Plaintiff's leave of absence was supposed to have been a 30-day
> leave; however, an error was made when the leave was entered into
> the system and Plaintiff was actually placed on a 45-day leave.
> Rather than direct that this error be corrected, I permitted Plaintiff the
> 45 days, but when this leave came to a close, I decided that the leave
> would not be extended again.  I concluded that I had been generous
> with Plaintiff thus far and that the employees who had absorbed his
> workload had done a very good job such that Plaintiff was not needed
> and there was no business reason to extend Plaintiff's leave once
> again.

(Bailey Affidavit at ¶ 6).  Moreover, during Bailey's deposition, when asked, "[I]s it fair to say

you made the decision to terminate Moien's employment?," Bailey responded "Mm-hmm."

(Bailey Dep. at 88).  Bailey further testified:

> When I made the decision, it was based on, I do not know when this
> employee will return to work.  I do not know.  It could be one day, it
> could be one year.  I don't know.  But it continues to drag on.  And
> despite an e-mail indicating that I will be back ASAP, I don't know
> what that means.  I don't know if being in Amman, Jordan means you
> are stuck in Amman, Jordan.  I don't know.  I know that I have to run
> the business.  And after 90 days, the employee was still not there

9

> after trying and trying and trying to give this employee chances to
> come back to work.  Therefore, we had to move forward in the
> business.

(Bailey Dep. at 99).  This testimony establishes that Bailey terminated Louzon for failing to

return from his leave of absence, and not for any sort of misconduct.

Louzon contends that the emails exchanged between Personnel Relations staff, after

Louzon's termination on August 24, 2007, indicate that Bailey was no longer involved in

Louzon's situation and that all internal communicates were directed toward Harris.  (Plf's Br. at

9-10).  Additionally, Louzon attempts to mischaracterize Bailey's knowledge of the voluntary

quit letter that was sent to Louzon by stating, "Bailey was not consulted, and was not even aware

that the '5 day quit' letter had been sent."  *Id*. at 13.  Louzon does not provide any evidence to

establish that Bailey was unaware of Louzon's termination.  Although Bailey did not know of

the exact letter that had been sent, Bailey testified that, "I was aware a document was going to be

sent . . . [a] document indicating that he had not shown up to work and that it was going to be a

voluntary quit."  (Bailey Dep. at 106).

While it is true that emails were directed toward Harris, this fact does not establish that it

was Harris who made the decision to terminate Louzon.  Rather, as discussed above, the record

indicates that it was Bailey who chose not to renew Louzon's leave, and in turn, terminate

Louzon under the Policy.  Louzon has failed to show that Bailey did not, in fact, make the

determination not to renew Plaintiff's leave and terminate his employment.  Conversely, Ford

has sufficiently established that Bailey was the "supervisor" and "ultimate decision-maker" in

this case.

II.     Are The Comparable Ford Employees Presented By Louzon Similarly-Situated?

10

Ford anticipates that Louzon will seek to introduce evidence and argument regarding seven current or former Ford engineers.  With regard to all of these engineers, Louzon contends that they were treated differently than Louzon because they were either not terminated after returning from a leave of absence, or granted longer leaves of absence.  As discussed above, it is the plaintiff's burden of proving a *prima facie* case of discrimination.  One of the elements that plaintiff must prove is that he "was treated differently from similarly-situated employees outside the protected class."  Louzon, however, fails to establish how each of these engineers were similarly-situated employees.

A.    Evidence And Argument Regarding Zaid Amro

First, Ford anticipates that Louzon will introduce evidence and argument regarding Zaid Amro ("Amro"), a Ford engineer from Jordan.  Like Louzon, Amro scheduled a vacation to the middle-east and was prevented from returning back to the United States as scheduled.  Upon his return, Amro was not terminated and continued his employment with Ford.

Amro worked as an electrical engineer in Ford's Electrical, Electronic Systems Engineering ("EESE"), which is part of the Product Development department.  In 2007, Amro scheduled a vacation to Jordan during the December holiday.  (Amro Dep. at 11).  While on his vacation, Amro was detained in Jordan because of a delay in his security clearance for his entry visa.  *Id*. at 21.  During this delay, Amro contacted his supervisor, Beth Profitt, and notified her of his delay "well before" his vacation time had been exhausted.  (Profitt Decl. at ¶ 3).  After Amro's 2007 vacation time had been exhausted, Profitt made the determination to place Amro on an unpaid, personal leave of absence until March 21, 2008, under Ford's Unpaid Personal Leave policy.  *Id*.  Amro returned to work on March 20, 2007, prior to the conclusion of his

11

leave.

The Court finds that Amro was not a similarly-situated Ford employee outside of the protected class who was treated differently than Louzon. The only similarity between Louzon and Amro is that both traveled to the middle-east and were prohibited from timely returning to the United States. There are, however, a number of material and relevant facts that distinguish Amro's and Louzon's situations.

First, the employees' situations were not handled by the same "ultimate decision-maker." The determination to end Louzon's leave was made by Bailey, whereas Amro's leave situation was determined by Profitt, who stated that she had no involvement in Louzon's termination and does not even know Louzon. *Id.* at ¶ 6-7.

Second, Amro notified his supervisor of his delay in Jordan *before* he was scheduled to return to work, whereas Louzon did not notify his supervisor that he would not be returning to work until more than a week *after* he was scheduled to return to work. Ford considered Louzon to be "AWOL" for nine days. Additionally, unlike Louzon, Amro returned to work prior to the expiration of his personal leave. Last, Bailey testified that Louzon went on vacation "on the eve of a critical product build" and the record does not indicate that Amro left for vacation under similar circumstances.

The evidence does not support Louzon's assertion that Louzon and Amro are similarly-situated. The decisions regarding Louzon and Amro were made by completely separate decision-makers, who supervised different departments. Moreover, the circumstances surrounding Louzon's termination, especially the timing of Louzon's actions, are different than the circumstances surround Amro's personal leave determinations. Because of these material,

12

differentiating circumstances, evidence concerning Amro's leave of absence is not relevant to the instant case, and should be precluded under FED. R. EVID. 401 and 402. Accordingly, the Court grants Ford's motion in limine as it relates to any evidence and argument regarding Zaid Amro.

III.    Six Terminated Engineers.

In addition to evidence regarding the decisions surrounding Amro's personal leave, Ford anticipates that Louzon will attempt to introduce evidence of six former Ford engineers who were terminated following personal leaves of absence. Louzon asserts that these engineers were treated more favorably than him because they were permitted longer personal leaves prior to being terminated.[2]

Ford contends that these engineers were not similarly-situated as Louzon because they were each terminated by a different decision-maker and there were differentiating circumstances surrounding each engineer. Because of these differentiating circumstances, Ford contends that evidence and argument comparing Louzon to these six engineers is irrelevant, and should be precluded under FED. R. EVID. 401 and 402. Alternatively, for the same reasons discussed above, Ford asserts that even if this evidence is found to be relevant, it should be precluded under FED. R. EVID. 403 because it is more prejudicial than probative.

A.    Evidence And Argument Regarding Roger Johnson

Roger Johnson ("Johnson") is a former Ford engineer who worked in the Sport Utility &

---

[2]With regard to each of these engineers, Louzon has also not identified whether they are outside the protected classes. Louzon alleges age discrimination (Louzon is 42) and national origin discrimnation (Louzon is Palestinian), but has not identified the ages or national origins of the employees he seeks to use for comparison.

Pick-Up Truck and Commercial Body on Frame Vehicle NCH (Noise Vibration Harness) department of Product Development. (McCarthy Decl. at ¶ 3-4). Johnson's manager, Mark McCarthy, granted Johnson a 3-month unpaid leave of absence so that he could tend to personal issues. *Id*. at 4. While on leave, Johnson notified McCarthy that he did not plan to return to Ford at the conclusion of his leave of absence. *Id*. After Johnson did not return from his leave of absence, his employment was terminated as a voluntary quit, just as Louzon was.

Ford contends that Johnson was not similarly-situated to Louzon because his leave and termination decisions were made independently by a different supervisor. In fact, in his declaration, McCarthy stated that he does not even know Louzon or Bailey. *Id*. at 6-7. In addition to being terminated by a different supervisor, Johnson notified his supervisor that he would not be returning to Ford prior to the end of his leave of absence. These are relevant and material differentiating circumstances between Louzon and Johnson that render them incomparable.

The Court agrees that Johnson was not a similarly-situated employee. Evidence regarding the termination of Johnson and the circumstances surrounding his leave of absence are not relevant and should be excluded under FED. R. EVID. 401 and 402. Accordingly, the Court grants Ford's motion in limine as it relates to any evidence and argument regarding Roger Johnson.

B.    Evidence And Argument Regarding Xiaoling Tian

Xiaoling Tian ("Tian") is a former Ford engineer who worked in the Body and Security Electrical department of Product Development. (Brombach Decl. at ¶ 3). Tian's supervisor, Ronald Brombach, granted Tian a leave of absence from mid-September 2007 to December 15,

14

2007. *Id.* at 3. Like Johnson, Tian notified his supervisor that he did not plan to return to Ford at the conclusion of his leave. *Id.* at 4. After Tian did not return from his leave of absence on December 15, 2007, his employment was terminated as a voluntary quit. *Id.*

For the same reasons discussed in Part III(A), above, the Court finds that Tian was not a similarly-situated employee and that evidence regarding the Tian's termination and the circumstances surrounding his leave of absence should be excluded under FED. R. EVID. 401 and 402. Accordingly, the Court grants Ford's motion in limine to the extent that it relates to any evidence and argument regarding Xiaoling Tian.

  C.  Evidence And Argument Regarding Sudhakar Varshney

Sudhakar Varshney ("Varshney") is a former Ford engineer who worked as a Core Engineer for Brake Tubes and Hoses within the Brake Engineering Department of Product Development. (Kapanowski Decl. at ¶ 3). In August 2006, Varshnay went on a "care of family member leave." *Id.* In October 2007, Varshney's supervisor, Martin Kapanowski, changed Varshney's leave to an unpaid personal leave of absence under Ford's Unpaid Personal Leave Policy and granted an extension of the leave until July 2007. *Id.* The Director of Chassis Engineering, Pandora Ellison, approved another extension of Varshney's leave until March 1, 2007. *Id.* Varshney did not return from his leave of absence on March 1, 2001 and his employment was terminated as a voluntary quit. *Id.* at ¶ 4.

Again, Louzon has failed to establish that Varshney was a similarly-situated employee. Varshney's supervisor, who states in his declaration that he does not know Louzon or Bailey, was not involved in Louzon's termination in any way. The decisions surrounding Varshney's termination and the decisions surrounding Louzon's termination, including each employee's

respective amount of leave, were made by different decision-makers.

Additionally, Louzon has failed to sufficiently establish that Varshney was treated differently than Louzon.  Like Louzon, Varshney was granted extra time away from work after an initial leave and was terminated as a voluntary quit after he failed to timely return from his leave.

In his brief, Louzon does not address how Varshney was a similarly-situated employee, and focuses solely on how he was granted a longer leave of absence.  Louzon has not a met his burden of showing that Varshney was a similarly-situated employee, and therefore evidence regarding the termination of Varshney and the facts surrounding his leave of absence are not relevant to the instant case.  Accordingly, the Court grants Ford's motion in limine to the extent that it relates to evidence and argument regarding Sudhakar Varshney.

      D.    <u>Evidence And Argument Regarding Renita Muirhead</u>

Renita Muirhead ("Muirhead") is a former Ford Certified Black Belt Vehicle Engineer who worked in the Vehicle Attribute Noise Vibration Harness department of Product Development.  (Larkins Decl. at ¶ 3).  In August 2008, Muirhead's supervisor, Paul Larkins, granted Muirhead a 3-month unpaid personal leave that began on August 30, 2008.  *Id*. at ¶ 4. Muirhead was scheduled to return from her leave on December 1, 2008.  *Id*.  Larkins denied Muirhead's request for an extension of her leave and Muirhead failed to return to work on December 1, 2008.  *Id*. at ¶ 5.  Muirhead was subsequently terminated as a voluntary quit, consistent with Ford's policy.  *Id*.; Plf's Br., Ex. R at 656.

Again, Louzon has also failed to establish that Muirhead was a similarly-situated employee or that she was treated differently than Muirhead.  Ford has established that the

16

decisions surrounding Muirhead's leave of absence were made by Larkins, a different supervisor than the one who made the decisions regarding Louzon's leave of absence. Larkins, who also states in his declaration that he does not know Louzon or Bailey, had no involvement in Louzon's termination. *Id*. at ¶ 6-7. Louzon, in turn, has not provided any facts or evidence to establish that Muirhead and Louzon were similarly-situated. For reasons discussed above, Louzon has failed to demonstrate that the termination of Muirhead and the circumstances surrounding her leave of absence are relevant to the instant case. Therefore, the Court grants Ford's motion in limine to the extent that it relates to evidence and argument regarding Renita Muirhead.

      E.      Evidence And Argument Regarding Heng Zhang

      Heng Zhang ("Zhang") is a former Ford engineer who worked in the Restraints department of Product Development. (West Decl. at ¶ 3). In March 2008, Zhang went on a "care of family member leave" of absence. *Id*. In April 2008, Zhang's supervisor, Sean West, changed Zhang's leave to a 3-month unpaid personal leave. *Id*. at ¶ 4. Zhang was scheduled to return from his leave on June 27, 2008. *Id*. Larkins denied Zhang's request for an extension of his leave and Zhang failed to return to work on June 27, 2008. *Id*. at ¶ 5. Zhang was subsequently terminated as a voluntary quit, consistent with Ford's policy. *Id*.

      Like the other Ford engineers, Louzon has failed to demonstrate that Zhang was a similarly-situated employee because the decisions made regarding Zhang's leave of absence were made by a different supervisor and were based upon the facts and circumstances surrounding Zhang's employment. *Id*. at ¶ 4. Again, Zhang's supervisor, West, declares that he does not know Louzon or Bailey. *Id*. at ¶ 6-7.

17

Considering the declarations provided by Ford, and the lack of evidence submitted by Louzon, Louzon has not met his burden of showing that Zhang was a similarly-situated employee. Louzon has therefore failed to establish that the termination of Zhang and the decisions made regarding his leave of absence are relevant to the instant case. Accordingly, the Court grants Ford's motion in limine to the extent that it relates to evidence and argument regarding Heng Zhang.

      F.      <u>Evidence And Argument Regarding Jian Pang</u>

Finally, Ford anticipates that Louzon will seek to admit evidence regarding the termination of former Ford engineer Jian Pang ("Pang"). Pang worked in the Exhaust/Induction/Mounts NVH Development department within the Powertrain Engineering organization of Product Development. (Knapp Decl. at ¶ 3). Like Varshney and Zhang, Pang went on a care of family member leave of absence in March 2008. *Id*. When Pang's family member leave ended in June 2008, Pang's supervisor, Gregory Knapp, requested that Pang be placed on a 30-day unpaid personal leave of absence. *Id*. at 4. Pang was scheduled to return from his unpaid personal leave on July 2, 2008. *Id*. Knapp states in his declaration that, because Pang was placed on "back to back" leaves of absence, he was required to get approval for Pang's unpaid personal leave from the Chief Engineer of his department. *Id*. When Pang failed to return to work on July 2, 2008, Pang was terminated as a voluntary quit.

Like the other six engineers discussed above, Louzon has again failed to demonstrate that Pang was similarly-situated to Louzon. The decisions made regarding Pang's leaves of absence were made by a different supervisor who has stated that he doesn't know the supervisor who made the decision not to renew Louzon's personal leave. Louzon has therefore failed to

establish that evidence regarding the termination of Pang and the circumstances surrounding his leave of absence are relevant. Accordingly, the Court grants Ford's motion in limine to the extent that it relates to evidence and argument regarding Jian Pang.

IV.   Louzon Is Ordered To Show Cause Why The Court Should Not Grant Summary Judgement In Favor Of Ford On Counts I and II.

FED. R. CIV. P. 56(f)(3) permits the Court to consider summary judgment on its own, independent of any motion filed by a party, if the Court identifies material facts that may not be genuinely in dispute. After reviewing the transcript from the July 12, 2010 hearing on Ford's motion for summary judgment before Judge Taylor, Judge Taylor's July 22, 2010 order (Doc. No. 60), and each parties' briefs in support or against Ford's motion for summary judgment, the Court finds that there are issues of fact that have not been adequately addressed by Louzon.

A.   Louzon Has Not Provided Evidence Of Similarly-Situated Employees.

In Count I of his complaint, Louzon alleges national origin and race discrimination by Ford. As discussed above, in order to prove a *prima facie* case for both age discrimination under the ADEA and national origin discrimination under Title VII, a plaintiff must show that: (1) he is a member of the protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a person outside the protected class or was treated differently from similarly-situated employees outside the protected class. *DiCarlo,* 358 F.3d at 414; *Mitchell*, 389 F.3d at 181 (6th Cir. 2004).

Because Louzon has not presented any direct evidence of discrimination, he must proceed under the *McDonnel Douglas* framework. *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Once Louzon establishes a *prima facie* case of discrimination, the burden shifts to Ford to articulate a legitimate, nondiscriminatory reason for its actions. *Barnes v.*

19

*GenCorp Inc.*, 896 F.2d 1457, 1464 (6th Cir. 1990). If Ford articulates such a reason, the burden

shifts back to Louzon to show that the legitimate, nondiscriminatory reason provided was a mere

pretext for retaliation. *Id.*

In light of the Court's decision to grant Ford's motion in limine to exclude evidence and

argument concerning Zaid Amro, Roger Johnson, Xiaoling Tian, Sudhakar Varshney, Renita

Muirhead, Heng Zhang, and Jian Pang, it does not appear that Louzon will be able to present any

evidence at trial of similarly-situated employees outside of the protected class who were treated

differently. Thus, it does not appear that Louzon will be able to present sufficient evidence to

establish a *prima facie* case of discrimination. Accordingly, the Court shall order Louzon to

show cause as to why this Court should not grant summary judgment in favor of Ford on Count I

of Louzon's Complaint.

B.    Louzon's *Prima Facie* Case For Retaliation

In Count II of his complaint, Louzon alleges that Ford retaliated against him for filing a

charge of discrimination with the EEOC. (Complaint at ¶ 25). Ford mailed Louzon's 5-day

"quit letter" to Louzon on August 22, 2007, and Louzon learned of his termination when he

return to work on August 31, 2007. Louzon filed his EEOC charge on September 20, 2007.

Louzon claims that Ford retaliated against Louzon for filing an EEOC charge by requesting, in a

letter dated October 9, 2007, that Louzon reimburse Ford for $5,535.73 in wages that Ford

overpaid Louzon. Louzon also asserts that Bailey provided a negative reference to a potential

employer.

To make out a *prima facie* case of retaliation under the *McDonnell Douglas* burden-

shifting framework, Louzon must first establish that: (1) he engaged in a protected activity; (2)

20

the protected was known to the defendant; (3) he suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

The Supreme Court has held that an "adverse employment action" requires a showing that "a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). "*[D]e minimis* employment actions are not materially adverse and, thus, not actionable." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000).

With regard to causation, a plaintiff must "proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).

Once Louzon establishes a *prima facie* case of retaliation, the burden shifts to Ford to articulate a legitimate, nondiscriminatory reason for its actions. *Virts v. Consol. Freightways Corp. of Del.*, 285 F.3d 508, 521 (6th Cir. 2002). If Ford articulates such a reason, the burden shifts back to Louzon to show that the legitimate, nondiscriminatory reason provided was a mere pretext for retaliation. *Id.*

Here, Louzon claims that two alleged adverse actions support his retaliation claim: 1) that Bailey provided a negative reference to a potential employer; and 2) that Ford sought reimbursement for overpaid wages.

After reviewing the Final Pretrial Order (Doc No. 65) and the record evidence in this

21

action, it does not appear that Louzon has identified any evidence to support his assertion that Bailey provided a potential employer with a negative reference.  Moreover, Ford has submitted evidence to refute the allegation.   (Bailey Affidavit, Fed's Mtn. for SJ, Ex. L).  Thus, unless Louzon can come forward with evidence to support his allegation that Bailey gave a potential employer a negative reference, Louzon will not be able to establish this alleged adverse employment action at trial.

In addition, after reviewing the Final Pretrial Order and record evidence int his action, The Court is unsure as to the evidence Louzon will submit at trial to show a causal connection between Louzon's EEOC charge and the letter from Ford seeking reimbursement of wages.

Accordingly, the Court shall order Louzon to show cause why this Court should not grant summary judgment in favor of Ford with respect to Louzon's retaliation claim.  Specifically, the Court shall require Louzon to present evidence of a causal connection between Louzon's EEOC charge and the alleged adverse actions taken by Ford.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's Motion in Limine to Exclude Evidence and Argument Concerning Non-Comparable Employees (Doc. No. 67).

IT IS FURTHER ORDERED that Plaintiff must show cause, in writing, on, or before **Friday, August 26, 2011**, why summary judgment should not be granted in favor of Defendant on Counts I and II of Plaintiff's Complaint.  Defendant may respond to Plaintiff's written response to the show cause on, or before, **Friday, September 2, 2011**.

IT IS SO ORDERED.

S/Sean F. Cox
SEAN F. COX

22

                                        UNITED STATES DISTRICT JUDGE

Dated:  August 12, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on
August 12, 2011, by electronic and/or ordinary mail.

                              S/Jennifer Hernandez
                              Case Manager